## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
| **CADENCE BANK, N.A.,**<br>**in its capacity as agent,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **CIVIL ACTION FILE** |
| | ) ) | **NO. _____** |
| **HERITAGE SPORTSWEAR, INC.,** | ) ) | |
| **Defendant.** | ) ) ) | |

## VERIFIED COMPLAINT FOR DAMAGES,
## APPOINTMENT OF A RECEIVER, AND INJUNCTIVE RELIEF

Cadence Bank, N.A. ("Plaintiff"), as agent for itself, Presidential Financial Corporation, and Woodforest National Bank, for its Verified Complaint against Heritage Sportswear, Inc., an Ohio corporation ("Defendant"), respectfully states and shows the Court as follows:[1]

### Parties, Jurisdiction, and Venue

1.     Plaintiff Cadence Bank, N.A. is a national banking association and successor-by-merger to State Bank and Trust Company, successor-by-merger to

---

[1] Capitalized terms used herein but not defined shall have the definitions ascribed to them in the Loan Agreement described in paragraph 15 of this Verified Complaint.

AloStar Bank of Commerce, with its main office at 1349 W. Peachtree St., Suite 100, Atlanta, Georgia.  Plaintiff is deemed to be a citizen of the State of Georgia.

2.     Presidential Financial Corporation is not a party to this action but is a Lender (as defined below) under the Loan Agreement (as defined below) with Defendant and non-defendant Heritage Holdco, Inc., a Delaware corporation ("Holdco"), as borrowers.   Presidential Financial Corporation is a Georgia corporation with its principal place of business in Georgia and is deemed to be a citizen of the State of Georgia.

3.     Woodforest National Bank is not a party to this action but is also a Lender under the Loan Agreement.  Woodforest National Bank is a national banking association headquartered in the State of Texas.  Woodforest National Bank is deemed to be a citizen of the State of Texas.

4.     Defendant is an Ohio corporation with its principal place of business at 102 Reliance Drive, Hebron, Ohio 43025.  Defendant is deemed to be a citizen of the State of Ohio.

5.     Under the terms of the Loan Agreement (as defined below), Defendant consented to non-exclusive jurisdiction of any federal or state court sitting in or with jurisdiction over Atlanta, Georgia, in any proceeding or dispute related in any way to any of the Loan Documents and waived all objections and defenses Defendant may have regarding such court's personal or subject matter jurisdiction, venue or inconvenient forum. (Loan Agreement at Section 13.4).

6.     This Court has personal jurisdiction over Defendant.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 on the grounds that this civil action constitutes a controversy between citizens of different states and the amount in controversy exceeds $75,000.

## Overview of Defendant's Business Operation

9.     Defendant is a supplier of blank apparel in the promotional products industry, including items such as t-shirts, pullovers, hats and other athletic related items.

10.    Defendant's corporate headquarters, primary warehouse and sales call center is located in Hebron, Ohio.

11.    Defendant also has warehouse locations in Virginia, Indiana, and Florida.

12.    Defendant is a wholly-owned subsidiary of Holdco, which operates solely as a stock holding company for Defendant.  On information and belief, Plaintiff states the Holdco has no material assets other than the equity interests in Defendant.

## Summary of Lending Relationships

13.    On or about February 16, 2017, Defendant and Holdco entered into a senior secured lending relationship with AloStar Bank of Commerce, Presidential

Financial Corporation, and Woodforest National Bank, as co-lenders, and AloStar Bank of Commerce, as agent for the co-lenders.

14.     State Bank and Trust Company later became the successor-by-merger to AloStar Bank of Commerce, and Cadence Bank, N.A., became the successor-by-merger to State Bank and Trust Company.  As a result of these mergers, Cadence Bank, N.A. is now one of three lenders, including also Presidential Financial Corporation and Woodforest National Bank (collectively, the "Lenders"), and the agent for all the Lenders.

15.     Under the lending relationship, Defendant and Holdco, as co-borrowers, Lenders and AloStar Bank of Commerce, as agent, entered into a Loan and Security Agreement dated as of February 16, 2017 (as amended from time to time, the "Loan Agreement"), under which the Lenders made revolving credit loans to, and extended other financial and credit accommodations to or for the benefit of, Defendant and Holdco. A true and correct copy of the Loan Agreement is attached hereto and incorporated herein as Exhibit A.

16.     Pursuant to Section 11 and Section 12 of the Loan Agreement, Plaintiff, as successor to AloStar Bank of Commerce, is the agent for each Lender on the terms set forth in the Loan Agreement.

17.     To secure the payment and performance of the Obligations, Defendant granted to Plaintiff, for the ratable benefit of Lenders, a first priority continuing security interest in and lien upon all or substantially all personal property of

Defendant, including, without limitation, all accounts; all chattel paper, including electronic chattel paper; all commercial tort claims; all deposit accounts; all documents; all general intangibles, including intellectual property; all goods, including inventory, equipment and fixtures; all instruments; all investment property; all letter-of-credit rights; all supporting obligations; all monies, whether or not in the possession or under the control of Plaintiff, a Lender, or a bailee or affiliate of Plaintiff or a Lender, including any cash collateral; all accessions to, substitutions for, and all replacements, products, and cash and non-cash proceeds of the foregoing, including proceeds of and unearned premiums with respect to insurance policies, and claims against any person for loss, damage or destruction of any collateral; and all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs and computer records) pertaining to the foregoing, and all products and proceeds of any of the foregoing (collectively, and as more particularly defined in the Loan Agreement, the "Collateral").

18.    Plaintiff perfected its security interests in and liens upon the Collateral by, among other things, filing a UCC-1 financing statement in the State of Ohio.  A true and correct copy of the UCC-1 financing statement is attached hereto and incorporated herein as Exhibit B.

19.     Pursuant to Section 5.12 of the Loan Agreement, Defendant and Holdco are jointly and severally liable for all Obligations under the Loan Agreement.

20.     In addition to the senior secured lending relationship with Plaintiff and Lenders, Defendant and Holdco are also parties to a subordinated note purchase agreement, pursuant to which Defendant issued a subordinated note dated May 2, 2012 (as amended from time to time, the "Huntington Note"), in the original principal amount of $6.3 million to The Huntington Capital Investment Company ("Huntington") and a subordinated note (as amended from time to time, the "Salem Note" and, together with the Huntington Note, the "Subordinated Notes") in the original principal amount of $4 million to Salem Investment Partners III, Limited Partnership ("Salem IP"; together with Huntington, the "Subordinated Creditors").

21.     To induce Lenders to enter into the Loan Agreement, the Subordinated Creditors, Defendant, Holdco, and AloStar Bank of Commerce, in its capacity as agent for Lenders, entered in to a Subordination Agreement dated February 16, 2017 (the "Subordination Agreement"), pursuant to which the Subordinated Creditors subordinated their debt and liens to the debt and liens in favor of Plaintiff and Lenders.

22.    On information and belief, Plaintiff states that Defendant owes the Subordinated Creditors a subordinated debt in excess of $10 million as of the filing of this Verified Complaint.

## **Existing Events of Default under the Loan Agreement**

23.    Soon after the closing, Defendant and Holdco breached the financial covenants set forth in the Loan Agreement, which covenants were based on Defendant's own projections.

24.    By May 31, 2017, approximately three and a half months after entering into the lending relationship with Plaintiff and Lenders, numerous Events of Default occurred, including the following:

- EBITDA Default. Defendant and Holdco failed to achieve EBITDA not less than $1,550,000 for the period of four months ending May 31, 2017, in breach of the financial covenant in Section 9.3.1 of the Loan Agreement;

- Improper Payments to Subordinated Creditors and Sellers. Defendant and Holdco made a number of payments to the Subordinated Creditors and other subordinated creditors in violation of the Loan Agreement, including the following:

  o Huntington Payment. Defendant or Holdco made payments to Huntington in respect of the Huntington Note in the amount of $74,379.47 on or about June 1, 2017 and $76,944.10 on or about July 3, 2017, in breach of Section 9.2.6 of the Loan Agreement and the Subordination Agreement;

  o Salem Investment Payment. Defendant or Holdco made payments to Salem IP in respect of the Salem Note in the amount of $47,215.35 on or about June 1, 2017 and $48,843.35

on or about July 3, 2017, in breach of Section 9.2.6 of the Loan Agreement and the Subordination Agreement; and

    o   Subordinated Sellers Payment. Defendant or Holdco made a payment to other subordinated creditors (referred to in the Loan Agreement as the "Subordinated Sellers") in the aggregate amount of $285,282.99 on or about July 3, 2017, in breach of Section 9.2.6 of the Loan Agreement and the Subordinated Sellers Subordination Agreement.

- Financial Statement Default. Defendant and Holdco failed to deliver to Plaintiff financial statements for the month ending May 31, 2017, on or before June 30, 2017, in breach of Section 9.1.3(b) of the Loan Agreement;

- Consignment Deliverable Default. Defendant and Holdco failed to deliver timely to Plaintiff a file-stamped UCC-3 amendment authorized by Gildan Activewear SRL ("Gildan") to amend the UCC-1 financing statement number OH00205283116 filed in favor of Gildan with the Ohio Secretary of State in breach of Section 9.1.11(a) of the Loan Agreement;

- Lien Waiver Deliverable Default. Defendant and Holdco failed to deliver timely to Plaintiff Lien Waivers in form and substance satisfactory to Plaintiff with respect to certain locations where Collateral was located in breach of Section 9.1.11(b) of the Loan Agreement; and

- Life Insurance Deliverable Default. Defendant and Holdco failed to deliver timely to Plaintiff a collateral assignment in form and substance satisfactory to Plaintiff of the life insurance policy insuring the life of Michael Jurden in breach of Section 9.1.11(c) of the Loan Agreement.

25. Defendant and Holdco were formally notified of each of these Events of Default by letter dated July 12, 2017 (the "Original Reservation of Rights

Letter"). A true and correct copy of the Original Reservation of Rights Letter is attached hereto and incorporated herein as Exhibit C.

26. The Original Reservation of Rights Letter and subsequent reservation of rights letters and other correspondence delivered by Plaintiff to Defendant stated and confirmed that Plaintiff and Lenders: (a) reserved their right to exercise all of their rights and remedies; (b) had not waived any Events of Default; (c) were under no obligation to honor any request for an advance because of the Events of Default; and (d) did not waive any Events of Default or any right or remedy by making an advance in the future.

27. Defendant acknowledged the continuing existence of Events of Default by, among other things, delivering Borrowing Base Certificates to Plaintiff on a routine basis, including as recently as February 1, 2019, which contained the following language:

> As of the date of this Certificate, Borrower is not in compliance with certain covenants required in section 9.3 [of the Loan Agreement], as described in Lendor's [sic] reservation of rights letter dated July 12, 2017.

**Post-Default Events and Failure of Defendant and Holdco to Respond**

28. After the occurrence of the Events of Default stated in the Original Reservation of Rights Letter, Lenders continued to make advances under the Loan Agreement, in each instance subject to the stated reservations of rights, including the right to cease further funding based on the existing Events of Default.

29.     While maintaining the reservation of rights, Plaintiff and Lenders sought to have Defendant address the existing Events of Default, provide a forward-looking strategy for the business operation, and enter into a forbearance agreement acceptable to Plaintiff and Lenders.

30.     Despite these efforts, the Events of Default previously stated continued to exist and were compounded by the occurrence of additional Events of Default.

31.     Defendant continued to experience significant cash flow deficits and failed to achieve its own projections.

32.     Defendant failed to obtain additional capital to support its business operation and fund its losses.

33.     Defendant failed and refused to ever execute a proposed forbearance agreement or amendment to the Loan Agreement to address such defaults.

34.     Meanwhile, on or about September 1, 2017, the Subordinated Creditors issued a letter to Defendant and Holdco stating that events of default existed under the Subordinated Notes and declaring their intent to exercise their remedies of acceleration of the indebtedness owed under the Subordinated Notes, which notice commenced a 180-day standstill period for debt collection action under the Subordination Agreement.  As of the filing of this Verified Complaint, that 180-day standstill period has expired long ago.

35.    After an extended period of consistent cash flow deficits, Defendant also experienced significant management disruption when Donald Schumacher, the CEO and Chairman of the Boards of both Defendant and its parent company Holdco, abruptly resigned his position with Defendant on September 17, 2018, without any meaningful transition plan.

### Defendant 's Failure to Obtain Refinancing or a Sale of Business

36.    In September 2018, after Schumacher's resignation, Defendant's remaining officers engaged the services of SSG Capital Management ("SSG"), an investment banking company, for the stated purpose of obtaining either a sale or refinancing of the business sufficient to repay in full the Obligations owed to Plaintiff and Lenders under the Loan Documents and to provide needed capital to successfully conduct the post-transaction business operation of the assets sold or refinanced.

37.    Despite the continuing Events of Default, Defendant requested Plaintiff and Lenders to continue making advances, in their discretion and subject to the reservation of its rights, under the Loan Documents so as to permit this marketing process to take place.

38.    During this process, Defendant's consistent position was that if the SSG marketing process failed to adequately address the payment of all Obligations to Plaintiff and Lenders (or was otherwise unacceptable to Plaintiff), that Defendant and its officers would cooperate with Plaintiff in connection with its

exercise of rights and remedies to sell the Collateral under Article 9 of the Uniform Commercial Code and/or, at Plaintiff's election, conduct an orderly liquidation of Defendant's assets in a manner acceptable to Plaintiff and Lenders to repay the Obligations.

39.   For more than three months, SSG conducted a concerted and comprehensive effort to identify any potential purchasers or refinancing alternatives for Defendant.

40.   After more than three months of marketing, SSG and Defendant failed to obtain even an expression of interest, much less a commitment, for refinancing or purchase of assets that would pay in full the Obligations owed to Plaintiff and Lenders.  As of the date of this Verified Complaint, Pathlight Capital LLC, which was Defendant's primary prospect for a refinancing transaction (which transaction would not have repaid the Obligations in full), has declined to proceed with such a refinancing transaction.

41.   Throughout the SSG marketing process, additional Events of Default continued to occur and remain uncured, while Defendant continued to sustain negative cash flow.

42.   In light of Defendant's marketing failure and continued cash flow deficits, Plaintiff commenced the process of identifying potential candidates for the purchase of all or part of Defendant's assets through a private foreclosure sale under applicable provisions of Article 9 of the Uniform Commercial Code.

43.    Maximizing the price for a private sale of Collateral located in four different states is highly dependent on Defendant's cooperation, which Defendant had agreed to provide.

44.    In preparing to exercise its Article 9 rights and remedies, Plaintiff communicated with Centergate Capital, LLC ("Centergate"), a potential purchaser of Defendant's assets first identified by Defendant before SSG's engagement and further pursued by SSG during the marketing process.

45.    Centergate expressed a strong interest in purchasing all or substantially all of the assets of Defendant but recognized that, for such a purchase to be effective and efficient, some level of reasonable cooperation would be required from Defendant, including assemblage and surrendering possession of Collateral located in multiple states in accordance with the Loan Documents and applicable law.

46.    Centergate also requested that Defendant reasonably cooperate in any such sale process by consenting to Centergate's direct contact with Defendant's landlords, software providers and certain other parties-in-interest, such as Gildan, an important supplier with certain consigned goods located on Defendant's leased premises, in order to accomplish a purchase.

47.    Defendant, however, failed and refused to honor its prior promises of reasonable cooperation and is thereby obstructing the lawful exercise of Plaintiff's rights and remedies, all to the direct detriment of the legitimate senior secured

status of Plaintiff and Lenders, by placing unreasonable conditions on offers to cooperate.

48.     Defendant's obstruction and lack of reasonable cooperation is irresponsible and unreasonable given the Events of Default acknowledged by Defendant as recently as its last request for a loan advance on February 1, 2019, Defendant's continuing cash flow deficits, Defendant's failed marketing effort to obtain any commitment which would pay in full the Obligations, and the conspicuous lack of any funding to conduct an ongoing business.

49.     Defendant's current business circumstances further establish the emergency need for the relief sought in this Verified Complaint, including the appointment of a receiver and the grant of injunctive relief.

50.     Defendant is currently in the part of its seasonal business cycle when sales are low, thus significantly exacerbating the effect of its substantial losses.

51.     While sales are currently low, this stage of Defendant's seasonal cycle unfortunately requires Defendant to make significant inventory purchases to prepare for the upcoming seasonal sales cycle, creating a present situation where revenues are low and cash needs to build inventory for the future are significant.

52.     To meet this anticipated seasonal demand, Defendant would need significant additional capital to immediately buy new inventory.

53.     Defendant, however, does not have money to buy inventory or to fund its cash flow deficits.

54.     Simply put, Defendant is currently experiencing these cash flow deficits associated with this point in the seasonal cycle to the direct detriment of the Collateral and property interests of Plaintiff and Lenders therein.  Defendant is unable to meet the increased demands for the coming season because Holdco and its owners are unwilling to provide desperately needed capital to achieve the appropriate inventory levels and because Plaintiff and Lenders, which have no obligation to make advances of any amount given the Events of Default, are unwilling to extend the significant funding that the inventory ramp-up would require.

55.     The nature of the seasonal cycle in Defendant's industry also has an impact on potential purchasers of Defendants' assets, further contributing to Plaintiff's urgent need for a receiver and injunctive relief.

56.     The marketing process described in this Verified Complaint has demonstrated that the only viable purchasers for the Collateral are entities already engaged in this industry.

57.     Those purchasers must also increase their inventory now and in the coming months.

58.     To the extent Defendant is allowed to obstruct and prolong a purchase of these assets, the window of opportunity to maximize a return on the Collateral will quickly close.

59.    The passage of time without the relief requested will have a direct and substantial detrimental effect on Plaintiff's and Lenders' ability to maximize the value of the Collateral and will adversely impact Defendant's remaining employees, suppliers, and customers.

**Need and Grounds for Appointing a Receiver**

60.    For the reasons previously stated, compelling grounds exist for the immediate appointment of a receiver and granting injunctive relief.

61.    Events of Default dating back to May 31, 2017 exist and continue under the Loan Agreement.

62.    Plaintiff has declared all of the Obligations due and payable and all other Commitments under the Loan Agreement terminated.

63.    Defendant is insolvent, lacks the money and direction to continue its business, and its unwillingness to cooperate on reasonable terms is willfully obstructing the lawful exercise of Plaintiff's rights and remedies that provide the only hope for accomplishing a viable sale of the collateral that maximizes the value of the Collateral and provides the opportunity for some level of continuing business that may preserve jobs and future opportunities for existing suppliers.

64.    The appointment of a receiver is necessary to gain control of and organize the Collateral for sale; to provide an effective, experienced decision-

maker for Defendant; to preserve, protect, collect and dispose of the Collateral; and to sell Defendant's business in an orderly and professional manner.

65.    Without the relief requested in this Verified Complaint, the Collateral will be at risk of damage or loss, and Defendant will not be able to maximize the value of the Collateral.

## COUNT ONE – BREACH OF LOAN AGREEMENT

66.    The averments contained in paragraphs 1 through 65 hereof are incorporated herein, the same as if fully set forth verbatim in this paragraph.

67.    Plaintiff and Lenders have fully performed all of their respective covenants, agreements and obligations under the Loan Agreement and the other Loan Documents.

68.    Events of Default have occurred and are continuing under the Loan Agreement.

69.    All Obligations are immediately due and payable by Defendant to Plaintiff and have not been paid by Defendant or Holdco, causing damage to Plaintiff and Lenders.

70.    As of the closing of business on February 1, 2019, Defendant and Holdco were indebted to Plaintiff and Lenders under the Loan Agreement in the approximate principal amount of $33,433,607.58, plus (i) accrued but unpaid pre-judgment interest on the principal amount of the Obligations at the Default Rate,

(ii) attorneys' fees and legal expenses, (iii) all other fees, expenses, bank fees, costs and other charges and obligations at any time owing to Plaintiff or Lenders under the Loan Documents (including Protective Advances that may be made by Plaintiff and Lenders), and (iv) post-judgment interest as provided by law.

71.     Plaintiff is entitled to judgment as a matter of law against Defendant for the indebtedness owing to Plaintiff and Lenders under the Loan Agreement.

## COUNT TWO – APPOINTMENT OF RECEIVER

72.     The averments contained in paragraphs 1 through 71 hereof are incorporated herein, the same as if fully set forth verbatim in this paragraph.

73.     Defendant's financial condition has deteriorated to the point that the Collateral has significantly declined in value and is at risk of further diminution and loss of value if a receiver is not appointed to take control of the Collateral and sell it in an orderly fashion.

74.     Defendant is insolvent and unable to pay its debts as they come due given the magnitude of the senior and subordinated debt and the current operational status of Defendant.

75.     Plaintiff and Lenders are suffering and will continue to suffer immediate and irreparable injury, loss and damage to the Collateral unless a receiver is appointed.

76.     Defendant's dire financial condition and its inability to preserve and protect the Collateral have jeopardized the Plaintiff's secured position.

77.     The appointment of a receiver is necessary to preserve, protect, and maintain the value of Plaintiff's secured interests in the Collateral.

78.     The Collateral and the proceeds thereof constitute a fund in litigation, and the Plaintiff's rights cannot be fully protected without the appointment of a receiver.

79.     There is an imminent and foreseeable danger of harm to the Collateral, requiring the intervention of equity to appoint a receiver to take possession and control of the Collateral.

80.     The Collateral securing Plaintiff's and Lenders' claims constitutes an asset charged with the payment of debts where there is manifest danger of loss, destruction or diminution in value thereof.

81.     The appointment of a receiver in this case is consistent with Rule 66 of the Federal Rules of Civil Procedure, 28 U.S.C. § 959, and applicable law.

82.     Plaintiff is entitled to the immediate appointment of a receiver having the powers, privileges, immunities and duties set forth in the proposed form of order annexed hereto as Exhibit D (the "Proposed Order").

## COUNT THREE – INJUNCTIVE RELIEF IN AID OF RECEIVERSHIP

83.    The averments contained in paragraphs 1 through 82 hereof are incorporated herein, the same as if fully set forth verbatim in this paragraph.

84.    Plaintiff has no adequate remedy at law and is in danger of suffering irreparable harm and injury as a result of imminent damage to or loss of the Collateral.

85.    Plaintiff is likely to succeed on the merits in this action.

86.    In connection with the appointment of a receiver as prayed for herein, it is necessary and appropriate for the Court to enter an order imposing an injunction to aid the receiver in fulfilling his or her duties and obligations as set forth in the Proposed Order.  This relief is necessary to implement the Proposed Order and to protect and preserve the Collateral.

WHEREFORE, Plaintiff prays that process issue and that Plaintiff have judgment against Defendant as follows:

(a)    Pursuant to Count One, that judgment for monetary damages be entered against Defendant and in favor of Plaintiff in the principal amount of $33,433,607.58 as of February 1, 2019, plus (i) accrued but unpaid pre-judgment interest on the principal amount of the Obligations at the Default Rate, (ii) attorneys' fees and legal expenses, (iii) all other fees, expenses, bank fees, costs and other charges and obligations at any time owing to Plaintiff or Lenders under

the Loan Documents (including the unpaid amount of any Protective Advances that may be made by Plaintiff and Lenders), and (iv) post-judgment interest as provided by law;

(b)     Pursuant to Count Two, that the Court enter the Proposed Order appointing a receiver for Defendant, its businesses and the Collateral, and all of the assets, income, revenue, expenditures, disbursements, books and records, goods and equipment relating thereto, with all of the powers and authorities as set forth in the Proposed Order;

(c)     Pursuant to Count Three, that the Court grant injunctive relief in aid of the receivership as provided in the Proposed Order;

(d)     That the Court grant Plaintiff such other and further relief as is just and equitable under the circumstances.

Respectfully submitted, this 4th day of February, 2019.


**PARKER, HUDSON, RAINER & DOBBS LLP**
Attorneys for Cadence Bank, N.A.


\_\_/s/ Rufus Dorsey_____
Rufus T. Dorsey
Georgia Bar No. 226705
Eric W. Anderson
Georgia Bar No. 016810

303 Peachtree Street NW
Suite 3600
Atlanta, Georgia 30308
(404) 523-5300

## VERIFICATION AND DECLARATION OF DAVID WALKER

I, David Walker, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

I am over 21 years of age and am otherwise competent to give this Declaration, which I make based on my personal knowledge and records of the business of Plaintiff Cadence Bank, N.A. ("Cadence Bank"), successor-by-merger to State Bank and Trust Company, successor-by-merger to AloStar Bank of Commerce.  I am a Managing Director of Cadence Bank.  I am authorized to provide this Declaration in support of the relief requested by Cadence Bank in its Verified Complaint For Damages, Appointment of a Receiver, and Injunctive Relief (the "Verified Complaint").  The matters of fact as pled in the within and foregoing Verified Complaint are true and correct to the best of my knowledge.

Pursuant to 28 U.S.C. § 1746, I declare and verify under penalty of perjury that the foregoing is true and correct.

Executed this ___1st___ day of February, 2019.

David Walker, Managing Director
Cadence Bank, N.A.

3399 Peachtree Road, NE
Suite 1800
Atlanta, GA 30326

- 23 -